and 13-2509, Craig Richard Gordon v. Eric A. Coleman, Jr., Attorney General. May it please the Court, my name is Leon Fresco, Deputy Assistant Attorney General at the Department of Justice on behalf of all of the appellants in the case. Is it possible to reserve five minutes for rebuttal, Your Honor? Yes, you may have it. I'd appreciate it if you would start by simply letting us know factually where the two plaintiffs are in terms of their removal proceedings. Yes, Your Honor. Ms. Castaneda, I believe, has a U visa. Is that correct? She's in the process of applying for a U visa. So her case has been administratively closed, and so she's not in removal proceedings at the moment? Is that correct? She's technically in removal. She's technically in removal, but I was told they were. And then Mr. Gordon has a petition for review pending in the Second Circuit Court of Appeals. So his case is a little bit more advanced and closer to removal. And when was that filed? The petition for review, I have it as filed, hold on. I have it that in March it was reinstated as petition for review, March of 2015. So it just recently was reinstated until that case continued. Is that correct? Yes. Thank you. Thank you, Your Honor. Your Honor, we're here today to resolve two critical questions, a statutory interpretation question and a punitive constitutional question. And the first question is about what the text of INA 236C really means. And that question is whether the court believes that in an effort to resolve the problem of criminal aliens redefending and absconding during removal proceedings, that Congress clearly intended to write a statute that would both create a mandatory rule, that would mean that DHS must detain certain criminal and terrorist aliens during their removal proceedings, but would also, at the same time, create an exception that swallows the entire rule. That exception being that detention is not mandatory if DHS is either unwilling or unable to quickly take aliens into custody for removal proceedings. The only way plaintiffs can win is if the court believes that this paradoxical rule is in fact what Congress clearly intended to write and that there is no other reasonable way to constitutionally interpret the language of this statute. Can you tell me what the purpose of this particular section is? Of when the alien is released, Your Honor? For Section C. Well, I think, Your Honor, the entirety of the purpose of 236C, as the BIA expressed in the Rojas case, was Congress's attempt to end the situation that had existed prior to 1996, where criminal aliens were released from custody and committed future acts or absconded from custody instead of being removed from the United States. That's what the legislative history clearly shows. The Supreme Court seemed to think that the reason for it was to mitigate the risk of flight Yes, Your Honor. and to protect the community from dangerous criminals. Yes, Your Honor. Would that be correct? Yes, Your Honor. All right. Can you tell me how, in the Castaneda case, that was accomplished? Yes, Your Honor. The intent of Congress is that the precognition effects of an immigration judge are imperfect. And so we don't know at any given time what a person in deportable status is going to do once they are informed that the government is trying to deport them. The statistics show high rate of flight in that situation and potential high rate of recidivism. And so the purpose of detaining Ms. Castaneda is once she is told that she is in removal proceedings, that creates a new sense of urgency to abscond that didn't exist when she was not told that she was in removal proceedings. Is that why you released her without bond? Well, Your Honor, if she is eligible for a U-Visa, a U-Visa would be a defense to her removal. That is not something that was known at the time of her apprehension. A U-Visa is when she is a victim of domestic violence that trumps even the aggravated felony that she committed in her case. But that's going to be the exception that someone in this deportable category of aggravated felony is going to be eligible for a U-Visa, Your Honor. Well, she hasn't received that. She's in the process of applying it. So is just applying for it enough for you to release someone without bond? Well, no, Your Honor. The statute is clear that here in this situation, Your Honor, that detention is mandatory. She was released on bond because there was an order from the court asking for her to be given a bond hearing. And so that bond hearing was held. And in that bond hearing, she was released, Your Honor. That is correct. But in that bond hearing, that's one of many bond hearings that occurs where the immigration judges don't know. They don't have perfect information. And what the statistics showed in DeMoor, and what the statistics continue to show, is that a number of those determinations where people decide are people flight risks or risks to commit additional crimes are underestimated. And that's the risk that Congress did not want to continue in this case. The word when seems to have an immediacy connotation to it. In fact, that's what the Supreme Court held in 1807 as to what when means. Is there any reason why that has changed? Your Honor, I think this is the debate that's gone on in the 80 or so cases that have adjudicated this issue. And the question is whether the when construct is duty-triggering or is time-limiting. And we believe the when language is duty-triggering. And we actually think there's some legislative history that supports that concept, Your Honor, that it's not meant to limit the time. It's meant to trigger the duty. That language, first of all, if Your Honor were to go to the House Report 104-828, it talks about this detention mandate, so the duty, applies whenever such an alien is released from imprisonment, regardless of the circumstances of release. So it's talking about the duty as opposed to it doesn't say anything about limiting by time. And then a second issue that has sort of come up for debate, Your Honor, is this issue of, well, how could it be possible that a criminal alien would be released early? Did Congress have that in mind? In fact, Congress did have that in mind, Your Honor. If Your Honor goes to another report that is cited in the board, which is the Senate Report 104-48, it talks about some states, upon learning that the INS wants to take custody of a prisoner when the prisoner's sentence expires, may advance the prisoner's release data and turn him over to the INS sooner than expected. But Congress did not want that because the Congress didn't want the federal government spending money having to detain these individuals during their removal proceedings. I think it's interesting that the BIA's position is this position with respect to the when. Put aside C-2 for a second, just set to C-1. I understand at no cost that it was your position that when meant immediately with respect to the duty that C-1 imposes regarding taking people into custody. Is that right? Well, not just on my question, just on C-1, not with respect to what C-2 means. Yes, Your Honor. But if there was no C-2 and it was just an order to the agency to pick people up, Roehoff seems to say that that order applies only immediately. I think Your Honor, yes, that when means is the duty to trigger when the release occurs. It follows that if under C-2 the reference to the when of Roehoff 1 picks up the when clause, when Roehoff picks up is when meaning immediately. I think Your Honor, just on that point, I just want to understand if I'm getting the logic right. I think Your Honor, that again, depends on what you view that as an ambiguous reference. That would be one that doesn't pick up the when clause. Yes, Your Honor. That's what Roehoff says. Correct. But if it did, given that the when clause in Roehoff's view under C-1 means immediately, then if it does pick up the when clause under C-2, that duty would only be triggered upon immediate release. I just want to understand. Well, there's two, I think, potential caveats to it. First, the when language in its view as a duty-triggering language and not a time-limiting language, picking it up has no consequence because it's just saying that the duty is triggered. And then second, that also takes us into the loss of authority line of cases, which would still say when Congress writes a statute like this, you wouldn't interpret it to have such a counterintuitive penalty unless it was more explicit than it is here. And I can cite four statutes. Well, that's just why I was going to get one. The conversation under C-1 is what means immediately. Correct or incorrect? That the duty is triggered immediately. C-1 only has, it says, you shall take him to custody. He may be just C-1. Yes, Your Honor. Does that word, when, mean immediately or not? That word, when, means that the duty begins at the moment of release. Yes, which is a breach to me. That doesn't mean that whatever position he hinges on, C-2 does not pick up the when clause. That is, you have his position in federal law that we defer to. Yes, Your Honor. That's the government's position. Yes, Your Honor. I'm trying to evaporate. Yes, Your Honor. My last question on this. What would mean effectively in Garcia, you seem to treat the when clause as relevant again, because the government's position in Garcia, if I understand it, is that the only people who can be detained are people who are released from A through D custody, which as far as I can tell only comes from some conclusion that the same defense language in the when clause is relevant to determining who can be picked up or who can be detained for A through D defense, because you don't take the position, government does not take the position, that anybody released from any custody is subject to C-2. You only take the position that those who were released from certain custody, A through D offenses, are subject to C-2. So that must be coming from the when clause. Am I missing something? No, I think, Your Honor, what it's coming from is it's saying that the people, when the Congress talks about the people described in paragraph one, the only description that is taking place are the four categories, A, B, C, and D. I think it's helpful in this regard. But we just said at this point, though, that I totally understand that logic, except in Garcia, the government's position is, which we have to defer to, according to you, is that the A through D offenders are only subject to mandatory detention under C-2 if they have been released not from any custody, but from the custody that they were held in, in virtue of A through D defense. You mean the Sasonic case? I'm getting that wrong again. Garcia is the BIA's pre-treatment to the Sasonic case in the first instance. Yes, Your Honor. I think there, the best way I would explain it is this, which is, actually, I would look at it from this court's precedent that this court has never wanted to offer. I want to look at it from your, the BIA's, issue's opinion in Garcia, which is you prefer to post-Sasonic. Yes, Your Honor. And in that opinion, they said, defer to us because we take the position that you cannot be taken under mandatory custody under C-2 unless you've been released from the custody for an A through D offense. Right, Your Honor. And where is that coming from? It's not the right clause. Well, Your Honor, I think it's coming from, again, the alien is described in paragraph one. If you read the alien as described in paragraph one, it's talking about those four categories. It's not talking about the tying of those. One of those offenses, not that they've been released from custody for having committed one offense of that kind. Right, Your Honor. But Garcia's position is, and the government's position is, we can only take into custody, according to mandatory detention, those people who have been released, not from any custody, but only from the A through D offenses. So I'm just trying to figure out, that must come from the one clause, right? Well, Your Honor, I think to sort of not be, not to get off track, I would say even if it comes from the one clause, it's not dispositive of this case. I think it's unclear from the language of the BIA where it comes from, and I think that's why the court ruled as it did in CESANA. And I actually think the CESANA ruling is important in this regard, which is that in CESANA, the court applied a clear and unambiguous definition of what the when clause served. And it served to say that if you were not released from one of the numerated offenses, that release doesn't count, it doesn't trigger mandatory detention. And so what I would argue is if that's the clear and unambiguous definition that this court has given for when released, there can't be a second clear and unambiguous purpose that the when release has been given, which is a temporal one. It's meant to say, this court has said that the purpose of that is to enumerate that the release had to have been for one of these enumerated offenses and not a non-enumerated. Counsel, could you clear up one thing for me? When you began your argument, you described situations in which the agency is either incapable of or unwilling to take someone into custody immediately upon release. What did you mean by unwilling? Is that a suggestion that there's some discretion? Well, no. So here's the point, Your Honor. This whole 1996 statute was passed in the backdrop of Congress's dissatisfaction of the manner in which the executive branch was detaining and deporting criminal aliens. And so what I'm just suggesting is that if the reasons for the dissatisfaction were to continue, it would be strange that Congress would create a penalty that would only undermine the very purpose of the statute that Congress wrote in that situation. So I'm not saying that anyone's unwilling now. I'm just saying that they would have to speak more clearly. And I think one statute that we've touched on. Does that mean that when you say that this is a mandatory provision, that there is no executive discretion? Yes, Your Honor. There's no executive discretion here. And I think one very interesting fact outside of the words of the statute, is there a separation of powers executive discretion? Sort of a prosecutorial discretion? The way the Department of Justice has enforced this, Your Honor, is this is a shall statute whenever ICE comes in contact with someone in this enumerated category. That's not the question I'm asking. I'm asking whether there is constitutional discretionary power. Well, certainly that is an issue that's up for debate, but it's not the way the statute is interpreted today. The statute is interpreted as a... Can I ask one more time? Yes. Certainly it's conceivable. Let me ask the question. What is the Department of Justice's position with respect to its constitutional authority on the question of executive discretion when it comes to this provision? I think in this provision, Your Honor, I think the Department of Justice doesn't view that it has the discretion to trump what Congress says, Your Honor. Let me just say one quick thing. If you look at the statute in 236A, the one right next to 236, not 236a, but B236A, it actually has the kind of statute that this court is trying to wrestle with where it says you have to... It's from the terrorist cases. It says you have to detain the person and then you have to either remove them or put them in removal proceedings or put them in criminal proceedings in seven days, and in seven days, that doesn't happen. You have to release the alien. Congress knows how to write that statute. They wrote it literally right next door to the statute that's written, and they didn't do that here, and I think that's a very persuasive statute to look at. There are other statutes. The detention statute post-removal, INA 241, talks about the same thing. You have 90 days to remove somebody. If you don't remove them and they don't fit one of the integrated categories, you have to release them. So Congress has two examples that they know how to write that statute, they know how to write the consequences. Can I ask you what that has to do with this situation? Because if the military detention person doesn't apply, there is no requirement to release. There's just the fallback to A. They're just held in detention. Well, I think what we're talking about here is whether they have an opportunity to make bond or not, so I don't quite get why that would matter. I think, Your Honor, that's a construct where you look at the 80 cases. If you view the case that way, is there any other way to do it? Yes, Your Honor. That detention position is not released. It's just subject to an opportunity to get bond. I think that's incorrect, Your Honor. The fallback to being a mandatory detainee under 236C is potentially never being detained or placed into a rule of proceedings. That's completely at the discretion then of DHS. They never have to take you in. They never have to put you into a rule of proceedings. They never have to do anything. But you just said to me, if when means immediately with respect to the duty to detain, if you don't immediately take them into custody, you never have to take them into custody. Right, Your Honor. That's true for C people, too. When one goes on, what are you supposed to do? In terms of sitting them? Oh, yes, sorry, Your Honor. Well, it also means when means immediately. Okay. Actually, let me ask you about that. Yes, Your Honor. If I may. Unless you're answering questions from a judge. Yes, of course, Your Honor. I mean, if I ask you to feed my cat when you get up in the morning and you get up in the morning and you don't do it, by 10 o'clock the light goes off in your mind, wouldn't you feel you're still under a duty to feed my cat? Correct. At some point, whenever I get to it, as long as your cat's not dead, I have to feed your cat. So when you're talking about triggering a duty, you're talking about turning the duty on. You're not talking about turning it on and off simultaneously. Correct, Your Honor. I think the best cases that sort of sign this are the ones that talk about, please return this book to me when you're finished. That's the kind of duty that's triggered here. It's not saying to me that you finished the book. Wrong. I don't want to give it to you. Just whenever you're finished, do that. Because otherwise, we put the kind of consequences into this statute that are not written in it, but that are written in other statutes. Thank you. Excuse me. So, I mean, based upon your position in response to Judge Howard's questions to you, even if an alien is free in the community for 25 years without problem, you're saying that there's the mandatory detention kicks in. Well, Your Honor, I think there's two ways to solve that imperfect problem. There is interpreting the statute in a way that lets many people whose detention would not be questioned be able to get bond hearings in contrast to Congress. Or you could leave and, as applied, you could interpret the statute the same way the Third, the Second, and the Tenth Circuit have done and leave as an exception in a safety valve case like that and as applied challenge. So we're not saying here that there should never be a safety valve of 25, 30, 40 years. Now, I wouldn't know. Congress has never put statute of limitations on crimes. This has been debated for 20 years in Congress that we put statute of limitations on. They've never done it. Meaning they still would want that person to be detained and removed. But putting that aside, to the extent that they implicate due process concerns, that could more easily be solved by an as-applied challenge than interpreting the statute in such a broad way that now creates national inconsistency and that basically, even though you have this reasonable list time period, makes ICE have to interpret it as an immediately requirement because they don't want to keep getting sued every single time and now they pick somebody up. So that's my answer. Thank you. Good morning, Chief Judge Lynch. And may it please the court. Matthew Siegel together with Adriana LaFay for Mr. Gordon. Congress has ordered the executive branch to detain certain criminal aliens when that detention can substantially benefit the public and when the executive cannot easily assess bond risk. Namely, when the alien is released from criminal custody. The government's position, just articulated, is that this targeted mandate can be read also to compel detention 5, 10, 25 years later. Even if a non-citizen like Mr. Gordon is living an exemplary life, and even if he is bouncing a grandchild on his knee when immigration agents come for him. The panel in this case correctly held that this reading must be rejected because it is contrary to the text and structure of 8 U.S.C. 1226, because it yields detention that is arbitrary and probably unconstitutional, and because it needlessly strips the government of authority to decide for itself, not based on precognition, but based on an ample post-release record, whether someone like Mr. Gordon or Ms. Castaneda should be released. When you say it's probably unconstitutional, the interpretation being advocated by immigration, what case do you rely on to say that? Because I look at the Moore, and the Moore seems to say, refer to the court's longstanding view that the government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings. It seems you can need Justice Kennedy to place some scrutiny on the length of that detention. But what do you point to limit Congress's ability to categorically say, we think with respect to this category of people, we can make a better decision than individual immigration judges? We point to the standards that were applied from Zedvede all the way through to DeMoore, which is whether there is a reasonable relationship between the detention and the underlying congressional purposes. And what we're seeing in these cases, both in the two individuals before the court and in our underlying class action, is a total divorce between any legitimate congressional purpose and the detention. Now, really the best support, Judge Cuyata, for this proposition are the arguments that the Solicitor General made in DeMoore and the argument that my colleague from the Department of Justice just made now, which is that all the way through, their understanding of 1226 has been that it can survive a facial challenge, which it did in DeMoore, but that there will be as applied challenges. And for purposes of the canon of constitutional avoidance, which wasn't at issue in DeMoore because there weren't really competing interpretations of the statute, it matters that we are faced here with two interpretations, one that creates and congregates many of these valid, if I say valid, at least serious as-applied challenges, and one that avoids them. And cases like Clark versus Martinez say before deciding who would win that constitutional challenge, we just cut it off by saying that we're not going to take that interpretation. Come back to my question, because I don't think I heard an answer. I've got the court talking about its longstanding view the government may constitutionally detain deportable aliens during the period of detention.  to that suggests some change or variation or limitation to what the court in DeMoore referred to as the longstanding view. I don't think that we have a case that contradicts that view, because we don't, in fact, disagree with it. We are not here challenging the government's authority to detain Mr. Gordon pending removal proceedings. In fact, the panel's interpretation of the statute says that the government retains this authority. What we are saying is that denying him the process of a bond hearing under the circumstances of this case, where it's five years from when he has a new US citizen son, he served in the military, and so on and so forth, under those circumstances, subjecting him to mandatory no bond detention is what raises the serious constitutional issues. And that's why this is at the bottom of a rather limited constitutional claim. Aren't there lots of individuals who rate the moment they get released and are picked up when released? If we looked at their individual circumstances, we could still see that perhaps that person would be very unlikely to have scammed. They fit to a tee, or they didn't re-bail even when they were charged with a criminal crisis. So we get back to, isn't Congress entitled to say, with respect to criminal aliens, it does not trust the individual determination guessing process that it wants to make a categorical decision? That is what the Supreme Court held in DeMora, and we don't challenge that. And so the way we understand that is that at that moment, and this goes back to the Department of Justice's point about precognition, the immigration judge is dealing with a rather limited set of records. And that's why you have before you an amicus brief from former government officials who say it's a far different circumstance when it's years later and we have a record that we can review of the non-citizen's post-release conduct. But I also want to back up and say that we're also here dealing with statutory text. And whatever the arguments that the government is making about what Congress could have thought, it remains the case that Congress simply did not write, and its core purposes confirm that it did not intend to write, a statute that has addressed the situation of people coming out of custody months or years later. It was quite clearly focused on people coming out of incarceration. That's all the language that this court used in Cesana, and again, in the panel opinion, is quite correct to say that Congress was not seeking to justify the detention of people who've been out in the community for years. To the extent that Congress can be said to have considered the question, the common sense points in the other direction of the government's argument, because, as the court said in Cesana, there's no reason to presume that these non-citizens are proverbialists. We draw the line, and I hear you saying you want us to read the statute to say that Congress meant to pick these individuals up when, but only when, they get released. I mean, if we say we're going to draw a timeline, we're going to draw a cutoff point, what is that point? How do we pick that point? Well, one of the key virtues of the panel's approach is that it permits the BIA some latitude to pick that point. Now, it's true, as Judge Barron's questions pointed out, that the BIA has previously said that two days is too long. The BIA could, if the panel's decision had remained law, would have an opportunity to go back and look and consider some of the problems. At one point, turn every case into an individualized determination if there's been more than a minute or two. Oh, not at all, Your Honor. Where would you draw the line where it's categorical? There's no need to make any determination that every single alien picked up within an hour. We don't have to have it. Where do you draw that line? Well, there's where we would draw the line, which may not ultimately matter. We would draw the line at immediately. But the BIA could well say that, in general, it's going to be 48 hours, because that's the period in certain government regulations where they seem to contemplate that they would be able to. Could they say two years? No, Your Honor. They could not. Could they say one year? We think not for a couple of reasons. One is. So how do they possibly draw this line? Or how are we to draw it? We ultimately, under your scenario, the courts ultimately have to draw it for them. Well, under our interpretation, the line has been drawn by Congress. Congress said when the alien is released, that means immediately. There can be some degree of debate about whether immediately means, as you say, in an hour or not. But what is off the table is the government's suggestion that when means forever. Then are you agreeing with your brother counsel's interpretation that when released language, if read the way you want, does not leave as an alternative an individual hearing? It leaves as an alternative no detention. Oh, no, Your Honor. It sounds like your theory depends on that logic. I, um. Otherwise, the court ends up drawing the line. The BIA doesn't. Congress has provided no indication of a willingness to entrust the court system with drawing that line. Well, I want to back up here and understand what the line is. Because my understanding, not understanding the government's argument this morning, the government's supplemental briefs stake out the position, as its position throughout this case, has been that it has absolute prosecutorial discretion about whether to initiate removal proceedings. And it has, until this morning, also taken the position that when the alien is released means any time after the release. You put those two things together, and the government's position throughout the entirety of these proceedings has been it never has to move quickly. It can wait 25 years. It has, in the case of our similar clients, waited 10 years. And it is at that point that the government says, well, now we don't have discretion. That's an entirely untenable expectation. You keep talking about when the government chooses. But in many instances, the practicalities of it are that there isn't any choice being made. They simply don't have the information available to them. Sometimes it's withheld by the states. Sometimes the criminal alien assumes an alias. I believe that happened in the Castaneda case. And so the government simply can't find the person to pick them up immediately. The government has asserted that, Your Honor. In its briefs, there is not any record evidence to support that assertion. It has not been our experience living in a class action that it is true. When the government spoke at a hearing in our case in December, I believe it was 2013, it said that 28 out of the 46 class members that identified were legal lawful permanent residents. These are not people who are hiding. But if that were true, then my answer to you, Chief Judge Lynch, would be the same as my answer to Judge Cayada, which is that the BIA, under the panel's interpretation of the When Release Clause, could account for those problems in deciding what period is accommodated or can be accommodated by the When Release Clause. And that view, particularly if the government were to prove up those practical considerations, may well get shoved on deference. But those people in the situation that Chief Judge Lynch is talking about are all subject to detention under A1 with respect to a bond hearing, just like all A through D people who are not released from an A through D offense are subject to that same detention. Now, the problem is, going right into the statute by its terms, because if you are somebody who lived an A through D offense before the TCPR runs out, in your first post-TCPR release, is for a non-A through D custody, they have no ability to put you in mandatory detention. That's right. So Congress knew that there was this problem, which raises the question, since they triggered the whole thing on release for certain types of offenses, why would they have done that if they didn't want to make the timing of the release relevant? Right? Because it's just a bit puzzling why they're going to tolerate people who have been around the committee for years when they can do the additional offense that they're released from custody from. But at the same time, they've got to just demand that you be in mandatory detention if you're released post-TCPR from an A through D offense, even if you're locked down for 10 years. To me, I don't quite understand the broad rationality. Other than that, as you say, the reason that they used the bond clauses, they were focused on the moment of release. At that moment, there's no record about whether you were good for at risk or not, so mandatory detention for all. I see that my time is up, and I understand. You may answer the question. Right. I just want to be careful about timing in this proceeding. So yeah, all of that is true, Judge Barron. But to answer the question about what Congress could have been thinking, for one thing, it is sufficient to say that they weren't thinking about these non-citizens. But I think there is an answer to the question, which is that my colleagues pointed out precognition. If someone has been out absconding, using aliases, committing additional offenses, even if they aren't enumerated in 1226C, it is not necessarily going to be an easy way for them to get bond. They are going to have a real uphill climb. And everyone's going to know on the full record, on the record that existed in the case of Mr. Gordon and in case Ms. Castaneda, whether an IJ should or should not release the person on bond. If we rule your way, then wouldn't we be saying that with respect to everyone who wasn't picked up largely at the gates of the prison, that we're restoring things to the status quo ante for that entire group, as they were before Congress passed this statute? In other words, we're back to the immigration judges trying to look at, well, he's been in the community. He's done this. I don't think even when we start the deportation proceedings and he sees it going badly, I don't think he'll flee. And making those judgments that they made before. And so aren't we just ourselves telling Congress, you're back to this thing. And there's nothing you can do about it because the executive can frustrate you simply by not being at the prison in time. Two points in response to that, Judge Scarlett, and I'll try to be brief. The first point is, it's the government's position that can frustrate this, because the government's position about its discretion is that it's infinite into the future. The second point, though, is that we would not be at the status quo ante. Because an immigration judge, and in fact the entire Department of Justice, in formulating its regulations or exercising its discretion, could, of course, look to 1226C and say, in the case of someone who's been out only six months and hasn't had a baby, let's say, in the meantime, you are in the class of people that Congress had intended would be detained promptly. And we are going to take that into account when deciding whether we, in the exercise of our 1226A discretion, are going to permit you to be released. So there's no way in which an immigration judge, on an individual basis, or the Department of Justice at a whole, would have to blind itself  Thank you, Your Honors. Good morning. May it please the Court, my name is Greg Romanofsky and I represent Leticia Castaneda. First of all, let me take this opportunity to clarify the facts of Ms. Castaneda's case, because I believe that will help answer Judge Toroya's question. How was the purpose, the general purpose, of preventing the release of dangerous people into the community and to prevent their flight, and how was it served by Castaneda's detention? First of all, there was no bond hearing. As soon as Judge Young ordered a bond hearing, the bond hearing was scheduled for Monday, and the government released Ms. Castaneda Friday afternoon, right before that. That's first. Second of all, she was not released because her U visa, because she had a U visa. Her U visa application was not even filed at that point, and the government had no idea that a U visa application would be filed in her case. And I can answer Judge Toroya's question, and I can answer why she was released. She was released because she did not pose any danger to the community, and she was not at flight risk. This is why she was released on her own recognizance, without even being required to pose any bond. I would like to emphasize the fact that mandatory detention is not just an inconvenience. It's not just a harsh outcome, in the words of the 10th Circuit's decision in Omas. It was an extreme and drastic measure that not only deprives the individual of one of the most fundamental rights, the right to be free from detention, it also, as Justice Souter pointed out in DeMore, impedes the person's ability to exercise his or her rights in immigration court and defend against deportation. So when someone's... Because mandatory detention is so drastic, when we're determining the constitutionality of the statute, what we have to do is we have to take the person's fundamental right to be free, and we have to weigh it against any government or public interest. In this particular case, the person's liberty, we're talking about the right to present evidence that you're not at flight risk. We're not talking about the right to be free from detention, period. We're talking about the right to present evidence that you're not at flight risk, and evidence that you're not a danger to the community. The interest, the liberty interest, is this high. What the Supreme Court said in DeMore is that the government's interest in protecting the public by ensuring that continuous chain of custody from state custody to immigration custody is so compelling that it even outweighs the interest of the individual, the most fundamental right of the individual. So the Supreme Court said that mandatory detention per se is not a constitution. Where do you get from DeMore the notion that they were hinging the state interest on a continuous chain of custody? Well, the continuous... In the majority or concurring opinion referred to that. The continuous chain of custody is what was behind the statute in the first place. And what 1226C is, is basically Congress telling the government, we do not trust you... When a person is released from state custody, we do not trust you, the government, to make a determination whether that person is dangerous or not, or whether the person is at flight risk, because you have very little information. You have virtually no information. You don't know how that person will behave when he is back in the community. Because you have no information, we don't want to take that risk. We want to protect the public from a mistake by the government. If the government releases a dangerous person by mistake, we want to protect the public from that. So once the person is released, that purpose is gone. So the liberty interest is still there, but the public interest drops, drops drastically, because, again, there is no presumption of danger at this point. There is evidence that the person can present to the immigration judge, and the immigration judge may say, you know what, you're still dangerous. I don't think you should be released. And the immigration, the government can still know the person. So it seems to me the problem, the concern about your interpretation, would lead to the conclusion that if the executive were ordered by the courts or Congress or whatever to pick up every criminal alien, the moment they get out and have the deportation proceeding right away, then that's the way you say we should interpret the statute, and that would be constitutional. And you'd have way more people being taken into detention and way more people being removed sooner. I apologize, can you repeat the question? Sure. If the executive wanted to comply with your interpretation of the statute, wouldn't they just start picking up everybody right away, and then there'd be no issue and no basis for a challenge? Well, not everybody, Your Honor. Right, and when he gets out of prison, the moment they come out the door, they pick up everybody instead of just some is now. Well, what 1226C is, what it does, it lists the specific categories of criminals. Right, all four of those categories. Right, yes. It picks up what 1226C is. It is a mandate to pick them up when they are released and keep them without bail. So under that approach, a lot more people would be taken into detention and being removed a lot sooner than they are now. It doesn't necessarily have to be related to the speed of removal, Your Honor. We're only talking about the… Well, if they're going to be in detention, wouldn't it be important that the removal proceeding be quick, be soon? We don't want to keep them in detention for a year or two. Yes, Your Honor, but, for example, in the case of my client, her new visa application has been pending for over a year, and if the government had their way, she would have been in detention as of today. She would have been in detention for almost two years. Well, no, then you've got Justice Kennedy's concurrence that you can work with, that you might get a lot of interest in that, which is, we're not talking about how long the detention lasts. We're talking about whether there can be a detention during the proceeding. And I keep coming back to, if we adopt your view, we're really saying to Congress and the executive, if you really want it, what you were trying to get Congress, and the executive wants to give you it, then pick up everybody right away and speed up the whole deportation process, which seems to me to be a worse situation for the very class that you're talking about than what we have now. May I answer that question? Yes, of course. Again, what I believe 1226C does, Your Honor, is it specifies the specific groups of individuals who need to be picked up at the time when they're released from state custody. And if they're not picked up by immigration at that point, then 1226C does not apply. There's a general duty that the Immigration Service has to initiate removal proceedings and deport people who are deportable. And we're not saying they cannot do that. What we're saying is that when 1226C is gone, when that mandate to pick the person up when the person is released is gone, a different duty is triggered. And the general 1226C is a duty to pick up the person when that person is released. It's a duty to protect the public from the risk of the unknown. A duty to protect the public from a possible mistake by the immigration judge. When that duty is gone, a different duty kicks in. Can we still initiate removal proceedings against these people? Of course. Can we still detain them? Of course. Can we detain them and deny their bond? Of course. But it's a different kind of duty. Thank you. Thank you. Mr. Fresco. Yes, Your Honor. I do want to tell you that since you've had most of the time this morning, when you're finished, I will give Mr. Siegel two minutes. Yes, Your Honor. If he needs the time. I'm fine with any time allocation the court pleases. Your Honor, a couple of points. That's the difference. Courts can do this. Yes. Yes, Your Honor. A couple of points I think are important here. First, in terms of sort of the government's ability here to take everyone in quickly, just to give you a lay of the land, here in the Boston area, the Boston field office, every detention officer, or sorry, it's called a fugitive enforcement officer, has 1,200 cases per officer. That is not an unwillingness to pick off people. What that means is if they picked up one person a day, which is hard to do because you have to find them and you have to make sure they're at a convenient time, et cetera, you have to do it the right way and have all the paperwork ready. If they picked up one person at a time, it would take them nearly three years to finish all their cases. How many people in that 1,200 fit within day three? Well, Your Honor, that's the 1,200 cases. Yes, per officer. Yes, Your Honor. That's what I've understood from ICE. That is a serious situation, and that's not on top of the fact of people we don't know about because they're in states that don't share information with us. But do you have detention space for all 1,200 per officer? Well, Your Honor, that's another important fact here is the detention space. Do you have detention space for the 1,200 persons per officer? I would imagine if we picked up every single person, we wouldn't have it here, for sure, in the First Circuit area. I have heard that the laws of history suggested Congress was aware of that because the agency said you wouldn't have detention space, which was why, you might think, we wanted to narrow the scope of A through D people who actually were supposed to put in mandatory detention, maybe to the class of people who were immediately released, which I take it would be quite small. I would argue it would be the opposite, Your Honor, which would be if you take the TCPR, that was the point I was going to get to next, they actually go through taking four categories, which are slightly different than the categories that ended up in 236C, and they ended up saying you can release two of these four categories, but you can only do it if they're all permanent residents and you apply the standard that we're talking about in 236A about flight risk and future dangerousness. And so the point is, why would they have done all of that machination about when you could release somebody if the other alternative was just if you don't pick them up in a day or two, don't worry about them. You can just forget about them and you don't have to do anything. In my view, that seems completely inconsistent with the intent of what Congress had, which was find these people. We know it's not going to be possible because of our appropriations to get everybody today and to detain everybody today, but when you get them, that's it. We don't want to hear any more stories about people being released from ICE custody and absconding and doing something else terrible in the community. We want that to end. That was the purpose of the statute, and it looks at these committee reports, talks about that as the clear purpose of the statute. And I think another key point that we haven't gotten into here today are the loss of authority cases, where the loss of authority case, not just the Montalvo-Morillo case, but the other ones, the Barnhart case, talk about the fact that if we were going to have such a counterintuitive statute, we'd have to have more than just this sort of guessing of when the aliens... I don't understand this loss of authority because you still have authority under Section 8. It's just that the only difference is that in one case, they have a right to a hearing for birth. That's the only difference. I think, Your Honor, the Castaneda case that my counsel, my colleague, describes is a perfect example of this. The authorities isn't the executive branches. It's Congresses. Congress has lost its authority when the statute is construed as 236A because, for example, Ms. Castaneda wasn't even taken to a bond hearing. Just a decision was made to release her. So my point was apparently she was not either a threat to the community or a threat to what's coming. But, Your Honor, my point is that... That's the reason why it isn't allowed to be given. But, Your Honor, my point is that Congress didn't want specific BHS officers to make that determination. Am I going to even put them into a hearing in front of an immigration judge or a specific immigration judge to make that determination? They thought, as a category, the criminal recidivism rates are too high. 77% one arrest, 45% two arrests, and then absconsion rates of 20% to 25%. That's unacceptable. And no matter how well we try, we're going to keep getting these mistakes. We don't want to hear about these cases anymore where we had someone in our custody and then they went away and they killed someone. Does the guy getting released tomorrow is committed one of the A through D offenses? It seems to me everybody agrees Congress wants him met at the court, met at the jail tomorrow when he gets out, picked up, and detained. That's the idea. That's the new U.S. trigger. And if we affirm the panel opinion, what we're saying is that one of those officers who have 1,200 people, he can just decide, you know what? I don't feel like I'm going to pick up that person and eliminate Congress's decision that that person be detained. That's what you would be saying, Your Honor, except the officer isn't even really making a decision. They're triaging like you would be in an emergency room. They're trying to figure out which of these 1,200 people do I try to get today, but at the end Congress wants them all detained. That was the point. But there's just not the resources. But Congress didn't say the sanction for that, for this one officer not being able to be Superman and pick up 1,200 people, is that now some people avoid mandatory detention and other people don't, Your Honor. I see I'm over my time. Thank you. Mr. Siegel, I won't guarantee you have the last word, but go ahead. Thank you, Chief Judge Lynch, for this bonus time. And I don't think I'll need, actually, to use the whole two minutes. Maybe I'll cede the rest to Mr. Romanowski. I just want to make two points. First, Judge Kaya, to ask you a question about whether this would solve the rule.  and the government can correct me if I'm wrong, is that the vast majority of people who have been detained with eligible C1A to C1D offenses are detained when they are released immediately. And that when they are not detained, it's not because someone steps late to the courthouse door. It's more likely because, as in the case of Mr. Gordon, they're doing an audit of, say, probation records years later. They're not just barely missing. What about Connecticut? This was in Connecticut. And we're told by the government, at least, that Connecticut doesn't really fully cooperate in letting the government know when people are getting out or not. They have raised that specter, Your Honor, but that was certainly not the case at the time of Mr. Gordon's detention, and it's not the case presently, because nothing in the Connecticut Trust Act prohibits the local authorities from telling the government about people in custody. In fact, they are required to tell the government about people in custody. And the other point I want to mention is this back and forth between my colleague, Mr. Fresco, and you, Judge Barron, about the government's strained resources. Well, it's true that the government has strained resources, and Congress was aware of that, and that is yet another reason why this statute cannot reasonably be construed for Congress to have said, go and get all the people when they're coming out of prison, and then also to contain an altogether separate, additional, and tacit mandate to go and find people, detain them where they live in their communities, and find the dead space for them as well. Thank you. Counsel, can I just ask you one question about the after D, where it begins with when the alien is released, the trailing, I can't tell if it's a clause or a phrase, without regard to whether the alien may be arrested or imprisoned again for the same offense. Do the cases tell us whether that's just a reference back to those who have been conditionally released, or is that the separate sovereign prosecution problem, or are there cases interpreting that particular phrase? I'm not sure, Judge Howard, if I know precisely the answer to your question. The best I can do is to say that the legislative history suggests that there was a lot of litigation under the old 1988 and 1999 versions of this statute, where courts were concerned, sorry, non-citizens made the argument that they couldn't be detained until after they had finished various other aspects of their sentences, whether it's parole and so forth. And my sense is that that language is part of the string that Congress used to make clear that upon release means as soon as you're not in a cell. In other words, even if there was a mistrial? Right. Even if they hated it, so therefore you could be tried for the same offense. Right, or possibly, again, I don't want to overstate my knowledge about the answer to this question, but we have seen cases where people are picked up on violations of probation, and I suppose there might be some question whether they're put in and imprisoned for the same offense. Thank you. Counsel for government, do you have a response to that question? I just look at the legislative history of what Congress said, and what they just say when they describe what they mean by that is they say this just means as soon as the person is released from any custody from any one of these crimes, we don't care what the future possibilities of that crime is, go get them and put them in detention proceedings. That's what the legislative history said. Thank you. This has been extremely well argued. We're grateful for the assistance in what is a difficult case. Have a good morning.